19-2738-cv
*Agosto v. New York City Department of Education, et al.*

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

―――――――――

AUGUST TERM 2019
No. 19-2738-cv

**JASON AGOSTO,**
*Plaintiff-Appellant,*

v.

**NEW YORK CITY DEPARTMENT OF EDUCATION, MANUEL UREÑA,**
*Defendants-Appellees.*

―――――――――

On Appeal from the United States District Court
for the Southern District of New York

―――――――――

ARGUED: JUNE 25, 2020
DECIDED: DECEMBER 4, 2020

―――――――――

Before:      CABRANES, LOHIER, and MENASHI, *Circuit Judges.*

Jason Agosto, a teacher at the public High School of Art and Design in New York City, appeals from a judgment entered August 12, 2019, by the U.S. District Court for the Southern District of New York (Hellerstein, J.). The court granted summary judgment to the New York City Department of Education and Principal Manuel Ureña on Agosto's claim of First Amendment retaliation and on his Title VII claims of a sex-based hostile work environment and retaliation. We affirm.

Agosto's speech consisted of grievances about employment disputes that are not matters of public concern, and therefore his speech was not protected against retaliation by the First Amendment. Even if some of Agosto's speech were so protected, the district court still would have been correct to grant qualified immunity to Ureña. The district court also correctly concluded that Agosto's *Monell* claim against the Department of Education fails because Ureña was not a policymaker, and therefore Agosto cannot identify any municipal policy that allegedly caused a constitutional violation.

Summary judgment was also properly granted on Agosto's Title VII claims. The sex-based hostile work environment claim fails because Ureña's actions were not sufficiently severe or pervasive to alter the terms of Agosto's employment. The retaliation claim fails because there is insufficient evidence of a causal link between Agosto's protected activity and the allegedly retaliatory acts.

Accordingly, we **AFFIRM**.

Judge Lohier concurs in part and concurs in the judgment in a separate opinion.

———————

JORDAN F. HARLOW, Glass Harlow & Hogrogian LLP, New York, NY, *for Plaintiff-Appellant*.

LORENZO DI SILVIO, Office of the Corporation Counsel of the City of New York, New York, NY (James E. Johnson, Richard Dearing, Aaron M. Bloom *on the brief*), *for Defendants-Appellees*.

———————

2

MENASHI, *Circuit Judge*:

Public high school teacher Jason Agosto alleges that he suffered retaliation in violation of the First Amendment after filing union and employment grievances critical of Principal Manuel Ureña. Agosto further alleges that Ureña's actions set official policy for the New York City Department of Education, which he argues should be liable for Ureña's actions pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

As a public employee, Agosto must demonstrate that the speech for which he allegedly suffered retaliation was made as a private citizen and was on a matter of public concern. We conclude that his First Amendment claim fails because his complaints were not on matters of public concern. His complaints alleged that Ureña had not followed proper collective-bargaining procedures before changing options available for teachers to use during their "professional period" each day, had not turned over budget documents that Agosto requested, had recruited another teacher to report what he heard at a teachers' union meeting, and had retaliated against Agosto for his actions within the union. This court's precedent makes clear that Agosto's complaints are not related to matters of public concern and therefore are not protected against retaliation by the First Amendment. Moreover, even if Agosto's speech were so protected, Ureña would be entitled to qualified immunity because a reasonable employee would not have been on notice that Agosto's speech involved a matter of public concern and also because the law on whether employment grievances are private speech was not clearly established at the time.

3

Agosto's *Monell* claim against the Department of Education fails because he has not identified a municipal policy that allegedly caused a constitutional violation. Agosto seeks *Monell* liability solely on the theory that Ureña's acts set final policy for the Department of Education. The Supreme Court has explained that a single official can create *Monell* liability only if state law provides that official with authority to set final, municipality-wide policy in the relevant area. No state law conferred such power on Ureña, who was one of hundreds of principals within the Department of Education subject to the chancellor's regulations and to statutory authorities regarding teacher discipline and evaluations. Agosto's claim boils down to the theory that Ureña was a final policymaker because his decisions with respect to Agosto were essentially unreviewable. But the Supreme Court has rejected the concept of *de facto* policymaking authority, which erroneously conflates a final decisionmaker (which Ureña may have been) with a final policymaker (which Ureña was not).

The district court also correctly granted summary judgment on Agosto's Title VII claims. His sex-based hostile work environment claim fails because he has not demonstrated severe or pervasive hostility in the workplace, and his retaliation claim fails because he has not demonstrated a causal link between protected activity and any allegedly adverse action.

We affirm the district court's grant of summary judgment to the defendants.

4

## BACKGROUND

### I

In 2004, Jason Agosto began working as a teacher at the High School of Art and Design, a public school in New York City. During the period relevant to this lawsuit, Agosto served as the chapter leader of the teachers' union. Defendant Manuel Ureña became the principal of the school in January 2016.

For the 2013-14 school year, the New York City Department of Education introduced a new system for evaluating teachers, who would be rated "highly effective," "effective," "developing," or "ineffective" in a series of categories. J. App'x 907. At the end of the school year, each teacher received an overall rating based on a combination of the ratings he or she received for performance and for student learning. J. App'x 908-09.

Agosto's ratings declined after Ureña became principal. In May 2016, Ureña observed Agosto's class and rated him "effective" in one category but "developing" in two categories and "ineffective" in four categories. J. App'x 148-49. Agosto received an overall rating of "developing" for the 2015-16 school year, which resulted in his placement on a teacher improvement plan for the 2016-17 school year, during which he had to meet weekly with Ureña. J. App'x 764-66, 917-18.

In December 2016, Ureña again observed Agosto and rated him "developing" in five categories and "ineffective" in two categories. J. App'x 212. Despite those ratings, Agosto received an overall rating of "effective" for the 2016-17 school year and was not placed on an improvement plan for the following year. J. App'x 920.

During the relevant period, Ureña wrote three "letters to file" for Agosto. Letters to file are notations of misconduct that do not directly constitute formal discipline proceedings but may lead to formal discipline. The teacher who is the subject of such a letter receives a copy, and it is placed in that teacher's personnel file.

The first letter was issued on May 27, 2016, because Agosto had been asked to send a week's worth of work to a suspended student but had allegedly refused to send more than the assignments for two days.

The second letter was issued on June 27, 2017, after the Parent Chairperson of the School Leadership Team sent a complaint to Manhattan Superintendent Marisol Rosales accusing Agosto of making a threatening statement after a meeting on June 15, 2017.

The third letter was issued on October 23, 2017, after Agosto allegedly kept turning around and asking Ureña the same question during a classroom observation session.

## II

During the 2015-16 and 2016-17 school years, Agosto filed numerous grievances about Ureña.

In May 2016, pursuant to the teachers' collective bargaining agreement, Agosto filed a union grievance claiming that Ureña had improperly modified the "C-6 menu," which provides options of professional activities that teachers may choose for their professional period each school day. J. App'x 365-68, 929-30. Agosto claimed that Ureña had met with him in advance to discuss the changes but had not shown the proposed changes to the union chapter as a whole and thus had violated a CBA provision. In June 2017, after a representative

6

of the chancellor of the Department of Education rejected this grievance, Agosto filed a grievance with the New York Public Employment Relations Board (PERB) asserting the same complaint about the C-6 menu.

In May 2016, Agosto filed another union grievance challenging Ureña's denial of Agosto's request for budget documents for the High School of Art and Design for 2011-14. Agosto said he "wanted to know where that money went, what happened with those budgets" because a prior principal had allegedly let an assistant principal make budget decisions without sufficient input from the teachers' union. J. App'x 122-24, 932.

In June 2017, Agosto filed a PERB complaint alleging that Ureña had made an assistant principal ask a probationary teacher to attend a union meeting and report back because Ureña "was working on terminating [Agosto] and was interested in knowing who the replacement would be." J. App'x 643-47.

In July 2017, Agosto filed another PERB complaint alleging that Ureña had retaliated against Agosto over a period of time because of Agosto's union activity.

In December 2017, Agosto filed a union grievance alleging that Ureña harassed Agosto after he filed his May 2016 grievance regarding the C-6 menu.

Agosto also alleges that Ureña "began sexually harassing [Agosto] in January 2017." J. App'x 971. Agosto's sworn affidavit states that the "first incident" was during a meeting on January 20, 2017, when Ureña is alleged to have suggestively licked a lollipop while looking at Agosto, who perceived Ureña to be "simulat[ing]

fellatio" with the lollipop. *Id.* Ureña claims that he had a lollipop tree in his office and often ate lollipops during meetings but did not do so suggestively. Agosto maintains that in early February 2017, he accused Ureña of sexually harassing him and then filed an EEOC complaint on March 16, 2017. Agosto alleges that Ureña's misconduct continued. For example, in May 2017, Ureña allegedly sang part of the song "Tomorrow" from the musical *Annie* while emphasizing the lyrics "I'll love you, tomorrow" and staring at Agosto. *Id.* In October 2017, Ureña allegedly followed Agosto closely down a hallway at school while shouting "It's a beautiful day." *Id.* Agosto also claims that Ureña would often "stare" or "sneer" at Agosto, "cat-call and clap" at him, and make unspecified derogatory and demeaning comments toward or about him. *Id.*

### III

In November 2017, Agosto filed a complaint in the U.S. District Court for the Southern District of New York, naming the New York City Department of Education and Ureña as defendants and alleging First Amendment retaliation, a sex-based hostile work environment and retaliation in violation of Title VII, and state-law violations. After discovery, the district court (Hellerstein, J.) granted summary judgment to the defendants on the federal claims and declined to address the state-law claims.[1]

On the First Amendment retaliation claim, the district court noted that Agosto's grievances "may" have been protected speech, J. App'x 1248-49, but, even if so, qualified immunity protected Ureña because at the relevant time there was no precedent clearly

---

[1] Agosto does not appeal the district court's decision declining to review the state-law claims.

establishing that Agosto's employment grievances would qualify for First Amendment protection from retaliation.

The district court also rejected Agosto's claim for *Monell* liability against the Department of Education, holding that there was no municipal policy or custom that caused the alleged violations. Ureña's decisions were reviewable by higher-level officials and thus could not be "final" policymaking decisions. Even if not reviewable, those decisions did not set municipal policy because Ureña's "status as a final *decisionmaker* with respect to teacher evaluations would not make him the final *policymaker*," and a "handful of disciplinary letters does not constitute municipal policy." J. App'x 1251-52.

On the Title VII hostile work environment claim, the district court held that Agosto failed to demonstrate that Ureña's conduct was based on Agosto's sex or that it amounted to objectively severe or pervasive hostile conduct. The retaliation claim failed because of the lengthy time gap between protected activity and adverse action, and any weak causal link was further undercut by the fact that the closest-in-time adverse action had been prompted by a third party— the parent who claimed Agosto threatened her after a meeting in June 2017.

Agosto timely appealed to this court.

## DISCUSSION

### I

Agosto argues that the district court erred by granting summary judgment on his 42 U.S.C. § 1983 claim alleging retaliation for speech protected by the First Amendment. Reviewing the matter *de novo*, *see Weintraub v. Bd. of Educ. of City Sch. Dist.*, 593 F.3d 196, 200

(2d Cir. 2010), we conclude that Agosto's grievances and complaints were not on a matter of public concern and therefore were not protected from retaliation by the First Amendment. Even if some of the speech did relate to matters of public concern, Ureña would be entitled to qualified immunity. Agosto also challenges the district court's grant of summary judgment to the Department of Education on his *Monell* claim, but we agree with the district court that Agosto has not identified any municipal policy that caused an alleged constitutional violation.

## A

To establish First Amendment retaliation by a government actor, the plaintiff must demonstrate that "(1) his or her speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him or her; and (3) there was a causal connection between this adverse action and the protected speech." *Montero v. City of Yonkers*, 890 F.3d 386, 394 (2d Cir. 2018) (alterations omitted).

When the plaintiff is a government employee, the first element is satisfied only if the employee "spoke as a private citizen and … the speech at issue addressed a matter of public concern"—that is, the speech must be "fairly considered as relating to any matter of political, social, or other concern to the community" and be of "'general interest' or of 'legitimate news interest.'" *Id.* at 393, 399. For public employees, speech that "principally focuses on an issue that is personal in nature and generally related to the speaker's own situation or that is calculated to redress personal grievances—even if touching on a matter of general importance—does not qualify for First Amendment protection." *Id.* at 399-400 (internal quotation

10

marks, citation, and alteration omitted). In this analysis, the "forum in which a petition is lodged will be relevant to the determination whether the petition relates to a matter of public concern" because a "petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context." *Borough of Duryea, Penn. v. Guarnieri*, 564 U.S. 379, 398 (2011). Even when a plaintiff satisfies these elements, the government may prevail by demonstrating that it "had an adequate justification for treating the employee differently" from other members of the public. *Montero*, 890 F.3d at 395; *see Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).

Each element of this analysis poses a question of law that we review *de novo*. *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013).

Agosto asserts that his speech "can be divided into several different categories," Reply Br. 4, each of which centers around certain grievances he filed. The defendants do not dispute that Agosto "spoke as a private citizen" when making those grievances, *Montero*, 890 F.3d at 394, but instead contend that none of his "categories" of speech addressed a matter of public concern, *see id.* We agree.

Agosto's first category of allegedly protected speech includes his complaints that Ureña did not fully comply with the collective bargaining agreement before making changes to the "C-6 menu." J. App'x 11-12. The form of Agosto's speech—internal union and PERB grievances—suggests the absence of a matter of public concern. *Guarnieri*, 564 U.S. at 398 ("A petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of

view beyond the employment context."). The specific subject of the grievances confirms that Agosto was not speaking on a matter of public interest. We have previously explained that "[l]abor versus management disputes, needless to say, almost invariably involve a conflict between the labor force and management over an issue that concerns the terms and conditions of employment" and that such disputes "often have a strong flavor of 'personal grievance' notwithstanding that the personal grievance is shared by numerous employees." *Lynch v. Ackley*, 811 F.3d 569, 581 (2d Cir. 2016). Agosto's complaints about Ureña's changes to the C-6 menu are no exception. Agosto does not identify how the dispute in this case about an internal CBA procedure for altering teachers' planning periods is of "political, social, or other concern to the [New York City] community" rather than an internal dispute of interest to employees. *Montero*, 890 F.3d at 400. Indeed, compliance with the CBA procedure could be of only limited interest because whether Ureña followed the approval procedure apparently would have no effect on the final policy.[2]

Agosto's second category of allegedly protected speech includes his May 2016 union grievance challenging Ureña's refusal to give Agosto copies of the school's budgets for 2011-14. Agosto wanted the budgets so he could "know where that money went, what happened with those budgets" because a previous principal had given too much budgetary influence to an assistant principal without sufficient input from the teachers' union. J. App'x 122-24, 932. Again, that Agosto filed an internal grievance suggests his actions were not

---

[2] *See* Oral Argument Audio Recording at 20:12-20:23 (Agosto's counsel stating that "[w]hether this proposal by Mr. Ureña was unilaterally implemented by him or implemented through the ratification by the C-6 procedure, … this modification was going to happen").

related to a matter of public concern. *Guarnieri*, 564 U.S. at 398. Moreover, Agosto's request appears to have been prompted by his personal grievance against the school's leadership for "den[ying] input of the chapter" in financial decisions relating to the school, J. App'x 122, rather than Agosto's desire "to protect the public welfare." *Ruotolo v. City of New York*, 514 F.3d 184, 190 (2d Cir. 2008); *see Singer*, 711 F.3d at 339 (noting that, in determining whether speech is on a matter of public concern, a relevant consideration is "whether the speech was calculated to redress personal grievances or whether it had a broader public purpose").

But even if Agosto sought these documents for reasons beyond his personal grievance, this court has previously held in an analogous context that it does "not think that the public has a substantial interest in minor payroll discrepancies amongst corrections department staff." *Singer*, 711 F.3d at 340. Although there might be differences between corrections department staff and public school teachers, Agosto was unable to identify any more substantial interest in seeking the budget documents than was found to be insufficient in *Singer*. Accordingly, Agosto's request and grievance were not protected speech sufficient to establish a retaliation claim.

Agosto's third category of allegedly protected speech focuses on his June 2017 grievance with the PERB accusing Ureña of attempting to enlist another teacher to attend a union meeting and report back because Ureña hoped to have Agosto replaced as the union's chapter leader. As with the actions discussed above, the fact that Agosto filed an internal grievance suggests his speech was not related to a matter of public concern. *Guarnieri*, 564 U.S. at 398. In any event, whether this is described as a personal dispute between Agosto and Ureña or as a "[l]abor versus management dispute[]," the subject

13

matter of his complaint confirms that it is not a matter of public concern. *Lynch*, 811 F.3d at 581. *Lynch* involved similar speech: the plaintiff had "fil[ed] a union grievance protesting [the police chief's] presence at a union meeting discussing the Department's flex-time policy." *Id*. This court observed that it was "far from clear" that a management official's attempt to interlope in a union meeting would be of any public concern. *Id.* The same is true here, where Agosto's concern appears to have been the protection of his own union leadership position rather than to address a matter of general public interest.

Agosto's final category of allegedly protected speech relates to his June 2017 grievance with the PERB accusing Ureña of retaliating against Agosto for representing other teachers during union activity. Filing a grievance raising his own alleged injuries is a paradigmatic example of an action that "principally focuses on an issue that is personal in nature and generally related to the speaker's own situation or that is calculated to redress personal grievances" and that we have therefore held "does not qualify for First Amendment protection" from retaliation. *Montero*, 890 F.3d at 399-400 (internal quotation marks, citation, and alteration omitted).

Agosto also claims that his underlying acts of advocacy for other teachers during union meetings was protected speech. But this court has rejected the notion that "all activities undertaken through a union necessarily become matters of public concern merely by virtue of their collateral connection to the union," *Lynch*, 811 F.3d at 582, and Agosto does not explain how his advocacy regarding other employees' internal employment disputes would transform those disputes into matters of public concern. *See Guarnieri*, 564 U.S. at 398.

Because none of Agosto's grievances or actions addressed a matter of public concern, his § 1983 claim for First Amendment retaliation fails.[3]

Even if some of Agosto's actions were protected, however, summary judgment would still have been properly granted to Ureña because he would be entitled to qualified immunity. Qualified immunity precludes individual liability when "reasonably competent" officials could disagree about whether the conduct at issue would violate a clearly established right. *Cartier v. Lussier*, 955 F.2d 841, 846 (2d Cir. 1992). To overcome qualified immunity, the alleged right must have been clearly established by Second Circuit or Supreme Court precedent at the time of the allegedly illegal action, *Montero*, 890 F.3d at 402, but Agosto has pointed to no such precedent here, relying instead on district court decisions. The analysis above demonstrates that a reasonably competent principal would not have been on notice that Agosto's speech was on a matter of public concern. Moreover, at the time of Agosto's speech, our caselaw was unclear about whether filing employment grievances was an act undertaken as a private citizen, though that issue was subsequently clarified. *See, e.g., id.* at 402-03; *Lynch*, 811 F.3d at 582 n.13.

---

[3] On appeal, Agosto raises a new alleged act of retaliation: Ureña's June 2019 decision to file against Agosto "section 3020-a charges"—a procedure by which tenured teachers face formal discipline. Appellant's Br. 18. Because none of Agosto's underlying speech was protected from retaliation, however, we need not address this new claim of subsequent retaliation. Moreover, the 3020-a charges were not included in the complaint, nor did Agosto seek leave to amend the complaint to include such claims. *See, e.g., Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 702 (2d Cir. 2010) ("[W]e note that plaintiff could have sought leave to amend his complaint, but did not do so.").

For these reasons, we affirm the district court's grant of summary judgment to Ureña on Agosto's § 1983 claim.

**B**

Agosto next challenges the district court's grant of summary judgment to the Department of Education on his *Monell* claim for municipal liability.

The elements of a *Monell* claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right. *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983). *Monell* expressly prohibits *respondeat superior* liability for municipalities, *Monell*, 436 U.S. at 691, meaning that a plaintiff must demonstrate that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged," *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 404 (1997); *Roe v. City of Waterbury*, 542 F.3d 31, 40 (2d Cir. 2008). "[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) (plurality opinion).

Rather than argue that there is a written municipal policy or an unwritten "practice [that] is so widespread as to have the force of law," *Brown*, 520 U.S. at 404, Agosto pursues *Monell* liability on the theory that Ureña's individual actions "represent official policy" for the entire Department of Education, *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000). The Supreme Court has said that a municipality may be liable for the acts of a single official—but only if that official is someone "whose edicts or acts may fairly be said to represent official policy" for the entire municipality. *Monell*, 436 U.S. at 694. It is not

16

enough that an official had discretion to make a decision that was unreviewable. *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003). Rather, the official must have been sufficiently "high up in the municipal hierarchy," *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992), that he was "responsible under state law for making policy in that area of the municipality's business," *Jeffes*, 208 F.3d at 57 (emphasis and alteration omitted). The authority to make policy "necessarily" means "the authority to make *final* policy." *Praprotnik*, 485 U.S. at 127. Stated another way, the official must have had state-law "authority to adopt rules for the conduct of [the municipal] government." *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992).

"Whether the official in question possessed final policymaking authority is a legal question, which is to be answered on the basis of state law," *Jeffes*, 208 F.3d at 57 (internal citations omitted), and therefore must be resolved "before the case is submitted to the jury," *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (emphasis omitted).

Agosto points to no state authority indicating that a New York City school principal has final "responsib[ility] under state law for making policy" in any "area of the [Department of Education's] business" at issue in this case, *Jeffes*, 208 F.3d at 57 (emphasis omitted), such that his "edicts or acts" would be considered to "represent official policy" for the entire municipality, *Monell*, 436 U.S. at 694.[4]  To the contrary, New York State law establishes that New York City

---

[4]  *See* Oral Argument Audio Recording at 7:51-8:10 (Agosto's counsel stating that "[t]here was no clear state or city policy outlining how and why a principal can issue individual letters to file and observation reports, so there was no policy to implement or frustrate").

school principals such as Ureña are "[s]ubject to the regulations of the chancellor," N.Y. Educ. Law § 2590-i, who possesses expansive powers to make policy for and to otherwise govern New York City schools, *see id.* § 2590-h(1) ("The chancellor shall ... [c]ontrol and operate … academic and vocational senior high schools."). For example, the chancellor has "authori[ty] to implement … 'such regulations and by-laws as may be necessary ... for the general management, operation, control, maintenance and discipline of the schools,'" *Price v. N.Y.C. Bd. of Educ.*, 51 A.D.3d 277, 279-80 (1st Dep't 2008) (citing N.Y. Educ. Law §§ 2590-h(17), 2554(13)(a)), and to "[p]romulgate such rules and regulations as he or she may determine to be necessary or convenient to accomplish the purposes of [the New York Education Law]," N.Y. Educ. Law § 2590-h(16). As relevant here, the chancellor has authority to make "a final determination" when teachers appeal poor ratings, *id.* § 3012-c(5-c), and to resolve formal disciplinary proceedings brought against teachers and staff, including the power to terminate their employment, *id.* § 2590-h(38); *see id.* § 3020-a.[5]

Because state law invests the chancellor with such authority, New York's highest court has held that "the city board [of education] and the Chancellor are responsible for policy having city-wide impact." *N.Y.C. Sch. Bds. Ass'n v. Bd. of Educ. of City Sch. Dist.*, 39 N.Y.2d 111, 119 (1976).

---

[5] State law also dictates its own detailed policies for the Department of Education in areas such as annual teacher reviews. *See* N.Y. Educ. Law §§ 3012-c, 3012-d (providing detailed requirements for "[a]nnual professional performance review of classroom teachers and building principals" and for "[a]nnual teacher and principal evaluations").

Accordingly, state law provides "that there is a[] final policymaker *other than* [Principal Ureña] with respect to" the areas of municipal business for which Agosto claims Ureña was setting policy. *Jeffes*, 208 F.3d at 60 (emphasis added); *see Praprotnik*, 485 U.S. at 127 (holding that the "authority to make municipal policy is necessarily the authority to make *final* policy"). The Supreme Court has cautioned that "a federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *Praprotnik*, 485 U.S. at 126.

Because the chancellor appears to be the final policymaker for the Department of Education with respect to teacher discipline and school administration, Agosto has difficulty articulating precisely how a school principal such as Ureña could have established municipal policy. Agosto initially contended that "Ureña issued Agosto [disciplinary letters and bad reviews] to implement the state and city policy of disciplining tenured teachers pursuant to Education Law Section 3020-a." Reply Br. 16-17. But that argument fails because the Supreme Court has held that "[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's [alleged] departures from them, are the act of the municipality" that must be challenged, *Praprotnik*, 485 U.S. at 127, and Agosto raises no challenge to § 3020-a itself.[6]  Agosto next argued that he does not "believe there needs to be an overall, department-wide policy" because Ureña set "policy within

---

[6]  Similarly, Agosto claims that Ureña's allegedly harassing conduct created municipal policy, but Agosto does not challenge the Department of Education's actual policies regarding harassment. *See, e.g.*, N.Y. Dep't of Educ., *Non-Discrimination Policy*, https://www.schools.nyc.gov/about-us/policies/non-discrimination-policy (last visited Aug. 5, 2020).

the school." Oral Argument Audio Recording at 11:02-11:05, 13:33-13:36. But a plaintiff must identify a municipal policy to prevail on a *Monell* claim, and the relevant municipal entity in this case is the Department of Education, not the High School of Art and Design. *See Walker*, 974 F.2d at 301 ("Walker is suing the City of New York, not Kings County. It is possible that an official could be a policymaker for one of New York City's constituent counties without being a policymaker for the City.").

Agosto has apparently settled on the theory that Ureña's disciplinary letters and negative evaluations were unreviewable by higher-level officials within the Department of Education, making Ureña the *de facto* final municipal policymaker on those specific matters involving Agosto. Even assuming that Ureña's actions were unreviewable, Agosto's claim still fails because the Supreme Court has rejected the "concept of '*de facto* final policymaking authority.'" *Praprotnik*, 485 U.S. at 131. A municipality's "going along with discretionary decisions made by [its] subordinates … is not a delegation to them of the authority to make policy." *Id.* at 130; *Auriemma*, 957 F.2d at 401 ("Authority to make a final decision need not imply authority to establish rules."). Agosto must demonstrate that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged," *Brown*, 520 U.S. at 404, but he has demonstrated no such deliberate conduct by the municipality here. The only deliberate actor was Ureña. Moreover, by equating a final decisionmaker with a final policymaker, Agosto's approach would effectively impose *respondeat superior* liability—making the municipality liable for the conduct of its employees—in violation of *Monell* itself. 436 U.S. at 691.

Agosto responds that even if Ureña were not the final municipal policymaker for teacher discipline and evaluations, he was the final policymaker at least for his own "discriminatory and harassing behavior towards Mr. Agosto." Appellant's Br. 28. In support of this argument, Agosto relies on a string of district court decisions that cite one another for the proposition that "a public school principal acts as a final policymaker to the extent that the ultimate harm that befell the plaintiff was under the principal's control."[7] But by erroneously equating a principal's final decisions

---

[7] *Zambrano-Lamhaouhi v. N.Y.C. Bd. of Educ.*, 866 F. Supp. 2d 147, 175 (E.D.N.Y. 2011); *see Eldridge v. Rochester City Sch. Dist.*, 968 F. Supp. 2d 546, 562 (W.D.N.Y. 2013); *Marino v. Chester Union Free Sch. Dist.*, 859 F. Supp. 2d 566, 569 (S.D.N.Y. 2012); *T.Z. v. City of New York*, 635 F. Supp. 2d 152, 179 n.27 (E.D.N.Y. 2009); *Lovell v. Comsewogue Sch. Dist.*, 214 F. Supp. 2d 319, 324 (E.D.N.Y. 2002); *Rabideau v. Beekmantown Cent. Sch. Dist.*, 89 F. Supp. 2d 263, 268 (N.D.N.Y. 2000); *see also Calicchio v. Sachem Cent. Sch. Dist.*, No. 14-CV-5958, 2020 WL 264959, at *11 (E.D.N.Y. Jan. 17, 2020); *Elgalad v. N.Y.C. Dep't of Educ.*, No. 17-CV-4849, 2018 WL 4572237, at *10 (S.D.N.Y. Sept. 24, 2018); *White v. Roosevelt Union Free Sch. Dist. Bd. of Educ.*, No. 15-CV-1035, 2017 WL 9485719, at *6-7 (E.D.N.Y. Dec. 20, 2017), *adopted*, 2018 WL 620485 (E.D.N.Y. Jan. 30, 2018); *Wellington v. Spencer-Edwards*, No. 16-CIV-6238, 2017 WL 11512684, at *6 (S.D.N.Y. Sept. 28, 2017); *N.U. ex rel. Amar v. E. Islip Union Free Sch. Dist.*, No. 16-CV-4540, 2017 WL 10456860, at *15 (E.D.N.Y. Sept. 15, 2017); *Krzesaj v. N.Y.C. Dep't of Educ.*, No. 16-CIV-2926, 2017 WL 1031278, at *10 (S.D.N.Y. Mar. 15, 2017); *Joinnides v. Floral Park-Bellerose Union Free Sch. Dist.*, No. 12-CV-5682, 2016 WL 3841096, at *11 (E.D.N.Y. July 13, 2016); *J.R. v. N.Y.C. Dep't of Educ.*, No. 14-CIV-0392, 2015 WL 5007918, at *10 (E.D.N.Y. Aug. 20, 2015); *T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 374 (S.D.N.Y. 2014); *Benedith v. Malverne Union Free Sch. Dist.*, 38 F. Supp. 3d 286, 316 (E.D.N.Y. 2014); *Fierro v. N.Y.C. Dep't of Educ.*, 994 F. Supp. 2d 581, 588 (S.D.N.Y. 2014); *Giscombe v. N.Y.C. Dep't of Educ.*, No. 12-CIV-464, 2013 WL 829127, at *7 (S.D.N.Y. Feb. 28, 2013); *T.P. ex rel. Patterson v. Elmsford Union Free Sch. Dist.*, No. 11-CV-5133, 2012 WL 5992748, at *4 (S.D.N.Y. Nov.

with a municipality's final policies, those cases make the same mistake as Agosto. We do not believe that approach is consistent with *Monell* and accordingly decline to adopt it. Such an approach would risk imposing *Monell* liability for almost every action a principal takes. *See Brown*, 520 U.S. at 415 ("Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability.").

Our conclusion that a New York City principal does not have municipal policymaking authority for *Monell* purposes here finds additional support in this court's decision in *Hurdle v. Board of Education of City of New York*, 113 F. App'x 423 (2d Cir. 2004). That case is especially instructive because we held that a New York City superintendent's final decision to transfer a principal did not set municipal policy.[8] "Any city acts exclusively through agents. If it were enough to point to the agent whose act was the final one in a particular case, we would have vicarious liability." *Hurdle*, 113 F. App'x at 427 (alteration omitted). *Hurdle* involved a superintendent—an official who outranks a principal such as Ureña—but this court explained that even when the official "is the apex of a bureaucracy," that merely "makes the decision 'final' but does not forge a link between 'finality' and 'policy.'" *Id.* The ability to

---

27, 2012); *Rausa v. Bd. of Educ. of the N. Syracuse Cent. Sch. Dist.*, No. 5:11-CV-1152, 2012 WL 967052, at *8 (N.D.N.Y. Mar. 21, 2012).

[8] "Although we decided [*Hurdle*] by nonprecedential summary order, rather than by opinion, our '[d]enying summary orders precedential effect does not mean that the court considers itself free to rule differently in similar cases.'" *United States v. Payne*, 591 F.3d 46, 58 (2d Cir. 2010) (quoting Order dated June 26, 2007, adopting 2d Cir. Local R. 32.1). Because the facts of *Hurdle* are particularly apposite, we consider that case here.

make a final transfer decision for one particular employee "does not establish that [the official] had the authority to set the policy authorizing involuntary employee transfers" for the entire municipality. *Id.* The same is true here. Even assuming Ureña's discipline, evaluations, and harassing behavior were final decisions, those acts did not set final municipal policy because Ureña lacked policymaking authority under state law.

Because Agosto's *Monell* claim rests on his erroneous theory that Ureña was a final policymaker for the New York City Department of Education, we affirm the district court's grant of summary judgment to the Department on Agosto's § 1983 claim.

## II

Agosto next challenges the district court's grant of summary judgment on his Title VII claims for a sex-based hostile work environment and for retaliation. Reviewing the matter *de novo*, *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 842 (2d Cir. 2013), we affirm.

## A

The district court concluded that Agosto's hostile work environment claim failed because he did not show an objectively hostile workplace or that the allegedly harassing conduct was because of Agosto's sex. We affirm on the first basis and therefore do not address the second.

A hostile work environment claim requires a plaintiff to show that his or her workplace was "so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his or] her employment were thereby altered." *Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013). "This

test has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002). The incidents typically "must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Id.* A single incident may qualify, but to do so it must be "extraordinarily severe." *Desardouin*, 708 F.3d at 105. Furthermore, the plaintiff "must demonstrate that the conduct occurred because of" his protected status—in this case, because of Agosto's sex, *id.*—and also that a "specific basis exists for imputing the conduct that created the hostile environment to the employer," *Petrosino v. Bell Atl.*, 385 F.3d 210, 221 (2d Cir. 2004).[9]

In support of his claim that he suffered a hostile work environment, Agosto contends that Ureña would "stare," "sneer," "cat-call and clap" at Agosto, and—on a few occasions over the course of a year—sang or talked in an unusual manner to Agosto. These latter incidents include once singing lyrics from the musical *Annie* while staring at Agosto, once saying "Hi, Mr. Agosto" in "a feminine voice," and once walking closely to Agosto while yelling "It's a beautiful day." Appellant's Br. 36-37; J. App'x 971, 1011. The district court did not err in concluding that these acts are insufficient to create an objectively hostile workplace. *See Desardouin*, 708 F.3d at 105 (noting that the workplace must have been "severely permeated with discriminatory intimidation, ridicule, and insult"). Title VII is not "a general civility code" but rather "forbids only behavior so objectively

---

[9] The defendants have not challenged the district court's judgment with respect to this final element.

offensive as to alter the 'conditions' of the victim's employment." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998).

Agosto responds by pointing to two discrete acts that he claims were so severe that, despite not being pervasive conduct, nonetheless created a hostile work environment. The first such act was in March 2016, when Agosto claims that Ureña stood closely behind Agosto—but did not touch him—while Agosto was bending over. In his briefing to this court, Agosto describes this as a "simulated act of anal penetration" on Agosto's body. Appellant's Br. 35. That is a serious charge. But it is contradicted by Agosto's own sworn affidavit filed at the district court. In opposition to summary judgment, Agosto attached an affidavit made under penalty of perjury in which he states that Ureña "began sexually harassing me in January 2017"—not in March 2016 or earlier—and the "first incident" of harassment was the January 2017 lollipop episode. J. App'x 971. Agosto's contention that the first instance of harassment was actually in March 2016 therefore contradicts his sworn affidavit and cannot create a material dispute of fact. *See Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991) (holding that a party may not "create a material issue of fact" by "disputing his own prior sworn testimony"). Moreover, Agosto's affidavit demonstrates that, at the time of summary judgment, even Agosto himself did not view Ureña's act in March 2016 as amounting to sexual harassment, let alone an incident severe enough on its own to create a hostile work environment. *See Alfano*, 294 F.3d at 374 (holding that, to create a triable issue, "the victim must also subjectively perceive that environment to be abusive").

Even setting aside his sworn affidavit, Agosto points to nothing in the record indicating that Ureña attempted to simulate a sex act on

Agosto. The March 2016 incident is not mentioned in the complaint, and Agosto's opposition to summary judgment did not attach the deposition transcript pages in which he allegedly described the incident,[10] meaning that the district court had no record evidence of the incident. *See* Fed. R. Civ. P. 56(c)(1)(A) (noting that the party opposing summary judgment must cite to "particular parts of materials" that are "in the record"); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (holding that "unsupported allegations do not create a material issue of fact"). The defendants' reply in support of summary judgment quoted what appears to be the relevant portion of Agosto's deposition, but that quotation says nothing about Ureña simulating a sex act on Agosto. The district court therefore understandably made no mention of the incident in its opinion. Given the state of the record on appeal, Agosto cannot demonstrate that the district court erred in concluding that there was no genuine dispute of material fact on this issue sufficient to defeat summary judgment.

The second serious act that Agosto identifies was in January 2017, when Ureña allegedly looked at Agosto while licking a lollipop. During his deposition, Agosto gave divergent descriptions of what he believes Ureña did with the lollipop, ranging from "simulating fellatio, back and forth in his mouth," J. App'x 1002, to testifying just seconds later that Ureña was merely doing "[w]hat you do when you lick lollipops," *id.* Even assuming Ureña did suggestively lick a lollipop, we conclude that, while offensive and inappropriate, that one-time act was not sufficiently severe to alter the terms of Agosto's

---

[10] *See* J. App'x 896 (Agosto's brief opposing summary judgment, in which he cites to pages 97-98 of his deposition transcript); J. App'x 996-97 (showing that, in Agosto's attached exhibits, the transcript skips from page 88 to page 101).

employment. Although a single incident can create a hostile work environment, the incident must have been "extraordinarily severe" and therefore is reserved only for the most egregious conduct. *Desardouin*, 708 F.3d at 105. For example, this standard was met when a plaintiff was raped, *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 136 (2d Cir. 2001), or was "punched in the ribs," "temporarily blinded by having mace sprayed in his eyes," and "covered … with shaving cream" all while being subjected to "racially offensive comments." *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 213, 230 (2d Cir. 2004). By contrast, this court has held that there was insufficient evidence of a hostile work environment when, for example, a plaintiff's colleague made a crude comment about her appearance and then "deliberately touched [her] breasts with some papers that he was holding in his hand." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

Although offensive and inappropriate, Ureña's alleged act of suggestively licking a lollipop is not in the category of "extraordinarily severe" single actions that create a hostile work environment, such as the acts in *Ferris* and *Patterson*. Nor was Ureña's alleged act even as severe as the intimate touching and sexualized comment that were held to be insufficient to survive summary judgment in our prior, binding decision in *Quinn*. Agosto does not claim that Ureña touched him at all, let alone that Ureña deliberately touched a sensitive body part as occurred in *Quinn*. Nor does Agosto claim that anyone else saw the lollipop incident or that it interfered with his ability to maintain discipline over his students or teach his classes—i.e., that it modified the terms of his employment. *See Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (holding that a jury

27

could conclude that the plaintiff's terms of employment and ability to do her job had been altered after a colleague aggressively shouted her down at a meeting by calling her extremely graphic sexual names "at length, loudly, and in a large group" containing many of her colleagues and subordinates, especially given that the profane "verbal assault included charges that [the plaintiff] had gained her office of lieutenant only by performing fellatio"). Ureña's alleged actions fall within the category of behavior that is "obviously offensive and inappropriate" but did not "alter the conditions of [Agosto's] employment" such that it was actionable. *Quinn*, 159 F.3d at 768.

Because there was no objectively and subjectively hostile work environment that altered the terms of Agosto's employment, we affirm the district court's grant of summary judgment on Agosto's hostile work environment claim.[11]

## B

Agosto also appeals the district court's grant of summary judgment on his Title VII retaliation claim. To establish a prima facie case of Title VII retaliation by a non-federal employer, an employee must show that (1) "he was engaged in protected activity," (2) "the employer was aware of that activity," (3) the employee suffered "a materially adverse action," and (4) there was "a causal connection between the protected activity and that adverse action." *Rivera v.*

---

[11] Because we affirm on this basis, there is no need to reach Agosto's arguments that Ureña's activity was motivated by sexual attraction and that the district court therefore erred by concluding that the actions were not because of Agosto's sex.

*Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014) (alteration omitted).[12]

We agree with the district court that Agosto failed to demonstrate an adequate causal link between his protected activity and allegedly adverse actions, and accordingly we do not address the other prima facie elements. In support of causation, Agosto relies solely on temporal proximity, and the closest chronological gap was the 3.5-month period between the EEOC complaint he filed on March 16, 2017, and the "letter to file" Ureña issued on June 27, 2017. This court has not imposed a strict time limitation when a retaliation claim relies exclusively on temporal proximity, *see Burkybile v. Bd. of Educ. of Hastings-on-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 314 (2d Cir. 2005), but even Agosto acknowledges that a gap of "more than several months" is typically too long by itself to survive summary judgment. Appellant's Br. 40. Even assuming some weak causal inference from the 3.5-month gap, that inference is fatally undermined by the fact that the June 2017 letter to file was triggered by an independent actor—the Parent Chairperson of the School Leadership Team who complained to the Manhattan Superintendent, accusing Agosto of making a threat after a meeting—indicating that Ureña's subsequent letter to file was not a contrived excuse to penalize Agosto for prior

---

[12] The retaliation provision applicable to the New York City Department of Education is 42 U.S.C. § 2000e-3(a), which contains no express adverse action requirement, and accordingly the Supreme Court has held that a plaintiff alleging retaliation need not have suffered a formal personnel action but rather only an action that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *see also* 42 U.S.C. § 2000e-16(a) (requiring, in Title VII actions against the federal government, demonstration of a "personnel action[]").

protected activity. Agosto's other alleged acts of retaliation are even more remote in terms of chronological proximity and therefore do not present triable issues.

The district court correctly granted summary judgment on Agosto's Title VII retaliation claim.

## CONCLUSION

We **AFFIRM** the district court's grant of summary judgment to the defendants.